**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| WE THE PATRIOTS USA, INC; | : | |
| CT FREEDOM ALLIANCE, LLC; | : | |
| CONSTANTINA LORA; MIRIAM | : | DKT No.: 3:21-cv-00597-JBA |
| HIDALGO; ASMA ELIDRISSI; | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| CONNECTICUT OFFICE OF EARLY | : | |
| CHILDHOOD DEVELOPMENT; | : | |
| CONNECTICUT STATE | : | |
| DEPARTMENT OF EDUCATION; | : | |
| CONNECTICUT DEPARTMENT | : | |
| OF PUBLIC HEALTH; BETHEL BOARD | : | |
| OF EDUCATION; GLASTONBURY | : | |
| BOARD OF EDUCATION; | : | |
| STAMFORD BOARD OF EDUCATION; | : | |
| | : | |
| Defendants. | : | AUGUST 9, 2021 |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS (DKT. No. 21, 22, 23)

The Defendants and proposed amici[1] deliberately ignore the central issue raised in this case. Connecticut Public Act No. 21-6[2] requires the Defendants to deny Connecticut children, including the Plaintiffs' children, any access to education in Connecticut if they do not abandon their religious beliefs and comply with the state of Connecticut's mandate that they receive vaccinations. Declining vaccinations on religious

---

[1] The following amici have sought permission to appear in this matter as of this filing: Americans United for Separation of Church and State, Central Conference of American Rabbis, Interfaith Alliance Foundation, Men of Reform Judaism, Reconstructionist Rabbinical Association, Union for Reform Judaism, Women of Reform Judaism, and Child USA.

[2] The state of Connecticut had not yet assigned the law a Public Act Number when the Plaintiffs sued. Thus, the Plaintiffs' complaint refers to the law as HB-6423, which has since been labeled Connecticut Public Act No. 21-6.

grounds bars the Plaintiffs' children from public and private schools, colleges, daycares, and other educational activities, and, if the Defendants take an even more heavy-handed approach, Connecticut Public Act No. 21-6 and other educational statutes and regulations would also permit the Defendants to require parents who homeschool their children to vaccinate them in accordance with their mandate. In other words, the Plaintiffs and every other similarly situated Connecticut parent faces an unthinkable choice: abandon their religious beliefs or forego educating their children.

This harsh hostility toward people of faith is not a reasonable effort to protect Connecticut children. It represents a naked attempt to outlaw people of faith from society while disguising their banishment as being in the public interest. Whatever the Defendants' asserted interest in protecting public health is, it does not extend to imposing Cornellian dilemmas in violation of the United States Constitution. Thus, the Plaintiffs respectfully request that the Court deny the Defendants' motions to dismiss (DKT. No. 21, 22, 23) in their entirety.[3]

## **BACKGROUND**

### **Connecticut Public Act No. 21-6 & Vaccine Ingredients:**

On April 28, 2021, Connecticut Public Act No. 21-6 officially became binding law in the state of Connecticut. **Dkt. 1, ¶ 15.** The act repealed the religious exemption to Connecticut's vaccination requirement for school children. Connecticut law now requires parents of children enrolled in preschool programs or any other prekindergarten program – public or private – to vaccinate their children on or before September 1, 2022 or not

---

[3] Because the Defendants' motions to dismiss share a nearly identical substantive theme with minor exceptions, the Plaintiffs oppose all of them in this memorandum of law.

later than fourteen days after transferring to another program even if doing so contradicts their religious beliefs. *Id.*, ¶ 17. Public Act No. 21-6, however, does not require parents of children already enrolled in kindergarten through grade 12 to vaccinate their children if they have previously claimed such an exemption and doing so would violate their religious beliefs – a practice often called "grandfathering." *Id.*, ¶ 17. Public Act No. 21-6 also retains the medical exemption to Connecticut's vaccination requirement. *Id.*, ¶ 18.

Vaccines pose several religious problems for people of faith. First, pharmaceutical companies use cell lines artificially developed from cells taken from aborted fetuses to research, develop, test, and produce their vaccines. *Id.*, ¶ 22. As of February 2020, the United States Center for Disease Control and Prevention (CDC) lists ten manufactured vaccines that contain human fetal cells, which are commonly administered to children. *Id.*, ¶ 23. It does not provide information on the use of these cell lines in the testing of various vaccinations. *Id.*, ¶ 23. Second, the presence of human fetal cells and DNA can cause strong autoimmune reactions in a person's body to the point where it turns against itself and starts killing its own cells and tissues. *Id.*, ¶ 24.

### The Plaintiffs & Their Circumstances:

In this lawsuit, five plaintiffs challenge the constitutionality and legality of Public Act No. 21-6: We The Patriots USA, Inc.; CT Freedom Alliance, LLC; Constantina Lora, Miriam Hidalgo, and Asma Elidrissi. Each is discussed in detail below.

We The Patriots USA, Inc. is a national nonprofit public charity dedicated to promoting constitutional rights and other freedoms through education, outreach, and public interest litigation. *Id.*, ¶ 2. A significant number of its members are Connecticut

parents affected by Public Act No. 21-6, and its members include Constantina Lora, Miriam Hidalgo, and Asma Elidrissi. *Id*., ¶ 2.

CT Freedom Alliance, LLC is a state public interest organization dedicated to advocating for religious freedom, medical freedom, parental rights, and educational freedom among others. *Id*., ¶ 3. It actively lobbied against the passage of Public Act No. 21-6 on behalf of its members. Most of its members are Connecticut parents affected by Public Act No. 21-6, and its members include Constantina Lora, Miriam Hidalgo, and Asma Elidrissi. *Id*., ¶ 3.

### ***Constantina Lora*:**

Constantina Lora is a Connecticut parent with a child who attends pre-school in Bethel, Connecticut, and they will enroll their child in kindergarten in the fall of 2022. *Id*., ¶ 25. She and her husband are devout Greek Orthodox believers who decline vaccination as a matter of faith. "First, they personally believe that to use or benefit from the use of aborted fetal cells is morally wrong and would constitute participation in what they feel was an act of intentional, premeditated murder of another human being." *Id*., ¶ 27. They also personally believe that injecting themselves with cells from other animals and chemicals – which are present in all vaccines – is morally wrong. *Id*., ¶ 27. Finally, the Loras believe that harming a child is morally wrong, and they believe that vaccinating their children would harm them, thus violating their faith. *Id*., ¶ 28.

The Loras moved to Connecticut from New York in 2021 to avoid being forced to comply with New York's repeal of its religious exemption to its school vaccination requirements. *Id*., ¶ 29. Lora's husband now commutes three hours to work every day because New York would not respect their religious beliefs and the Loras refused to

4

abandon them. *Id*., ¶ 29. Their child will now be subject to Public Act No. 21-6's vaccination mandate and will not receive a religious exemption. *Id*., ¶ 25.

### *Miriam Hidalgo*:

Miriam Hidalgo is a Connecticut parent with two small children who are currently eligible for daycare and will be eligible for preschool in the fall of 2021 in Glastonbury, Connecticut. *Id*., ¶ 31. She and her husband are devout Catholics, and they decline vaccinations on two grounds. *Id*., ¶ 32. "First, they personally believe that to use or benefit from the use of aborted fetal cells is morally wrong and would constitute participation in what they feel was an act of intentional, premeditated murder of another human being." *Id*., ¶ 33. Second, they have agreed to raise their children as vegans – a decision that comes from Miriam's personal religious beliefs. *Id*., ¶ 34. Thus, they believe that injecting their children with cells from other animals such as pigs is morally wrong. *Id*., ¶ 34.

The Hidalgos operate three small businesses to support themselves and their family. *Id*., ¶ 35. While Miriam has dedicated herself to being a stay-at-home mother, she still has responsibilities pertaining to those businesses. *Id*., ¶ 35. Thus, homeschooling their children would place an overwhelming burden on her – even assuming that the Defendants will not require her to vaccinate her children anyway. *Id*., ¶ 35.

### *Asma Elidrissi*:

Asma Elidrissi is a Connecticut parent with two small children who are currently eligible for daycare and preschool and one of whom will need to register for kindergarten in the fall of 2021 in Stamford, Connecticut.[4] *Id*., ¶ 6. She and her husband are immigrants

---

[4] Asma and her husband could not complete their child's registration before Public Act No. 21-6 took effect, thus missing the opportunity to "grandfather" at least one of their children into the old religious exemption regime. *Id*., ¶ 36.

to the United States, and they are devout Muslims who decline vaccinations on three religious grounds.

"First, they personally believe that to use or benefit from the use of aborted fetal cells is morally wrong and would constitute participation in what they feel was an act of intentional, premeditated murder of another human being." *Id.*, ¶ 33. Second, they abstain from pork in accordance with the well-established Muslim religious prohibition on consuming pork. *Id.*, ¶ 39. Porcine gelatine – a derivative of pork – is used as a stabilizer in certain vaccines, including ones that the Defendants will require. *Id.*, ¶ 39. Finally, Asma and her husband hold the sincere religious belief that harming children is morally wrong, and they unfortunately have personal experience with such a disaster. *Id.*, ¶ 40. Relying on a doctor's assurance that vaccines posed no harm to her children and that they had no products barred by her religion, Asma and her husband allowed their son to receive a measles, mumps, and rubella (MMR) vaccination. *Id.*, ¶ 40. He incurred serious health problems and ultimately developed a speech and learning disorder for which now he requires special services. *Id.*, ¶ 40. After fully informing themselves, Asma and her husband found that their doctor misled them, and they now decline vaccines as a matter of faith. *Id.*, ¶ 40.

Asma and her husband are not wealthy, and both are working parents at a small business that they own. *Id.*, ¶ 41 Asma currently needs to return to work to supplement their income so they can provide their children with a full and fair chance at the American dream that they have come to the United States to pursue. *Id.*, ¶ 41. If their children cannot attend any school or day care – public or private, Asma will be unable to return to

work. *Id*., ¶ 41. Relocation is not an option for them either as they have put down deep roots in Connecticut, including starting and running a business in the state. *Id*., ¶ 41.

## ARGUMENT

Under Fed. R. Civ. P. 12(b)(1), the Court may grant a motion to dismiss for lack of subject matter jurisdiction "when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citing Fed. R. Civ. P. 12(b)(1)). The plaintiff bears the burden of proving the existence of subject matter jurisdiction by preponderance of the evidence. *Id*. The Court may consider affidavits when determining whether to dismiss for lack of subject matter jurisdiction. *All. For Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 (2d Cir. 2006). The Court, however, must "accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor." *Saleh v. Sulka Trading*, 957 F.3d 348, 353 (2d Cir. 2020).

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Plausibility is not a probability standard. In other words, a pleading must show, not merely allege, that the pleader is entitled to relief. *Id*. Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the presumption of truth required by the

motion to dismiss. *Id*. The Court, however, must accept all of the factual allegations in the operative complaint as true and draw all reasonable inferences in the non-movant's favor. *Graziano v. Pataki*, 689 F.3d 110, 114 (2d Cir. 2012).

**I.  The Court Should Deny The State Agency Defendants' Motion To Dismiss Counts One Through Four For Lack Of Subject Matter Jurisdiction Because The Plain Language Of The Eleventh Amendment Does Not Bar Federal Suits Against A State By Its Own Citizens.**

The Connecticut Office of Early Childhood Development, the Connecticut State Department of Education, and the Connecticut Department of Public Health ("State Agency Defendants") move to dismiss Counts One through Four of the Plaintiffs' complaint on the grounds that the Eleventh Amendment protects a state from suit in federal court by its own citizens.[5] The Plaintiffs concede that United States Supreme Court precedent supports the State Agency Defendants' position and that the Court is bound to follow those decisions. *See Alden v. Maine*, 572 U.S. 706 (1999); *Hans v. Louisiana*, 134 U.S. 1 (1890). They, however, assert and preserve their claims for appeal that the text of the Eleventh Amendment only precludes federal diversity actions brought by citizens of other states, not federal question actions brought against a state by its own citizens.

The plain language of the Eleventh Amendment reads: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, of by Citizens of Subjects of any Foreign State." Despite the Supreme Court's expansion of this language, nothing in it precludes citizens of a state from suing that state for equitable

---

[5] The State Agency Defendants concede that they have waived their Eleventh Amendment immunity as to Count 5. *See* **Dkt. 22-1, p. 7 n.8**.

relief in federal court, which the Supreme Court acknowledged as recently as *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 69-70 (1996).

As Justice Souter pointed out in his *Alden* dissent, state sovereign immunity was a product of common law, not the federal constitution. *Alden v. Maine*, 572 U.S. 706 (1999) (Souter, J., dissenting). The federal constitution creates no immunity for states against federal question actions brought by their own citizens. Thus, the Plaintiffs urge the Court to follow the plain language of the Constitution and reject the Defendants' assertion of Eleventh Amendment immunity for Counts One through Four.

In the alternative, if the Court does not agree, the Plaintiffs request that the Court dismiss Counts One through Four with respect to the State Agency Defendants without prejudice to them reamending to add the respective agency officials in their official capacities as defendants under *Ex Parte Young*, 209 U.S. 123 (1908).

## II.   The Court Should Deny The Defendants' Motions To Dismiss All Claims Brought By We The Patriots USA, Inc. and CT Freedom Alliance, LLC Because They Have Pled Sufficient Facts To Give The Court Subject Matter Jurisdiction.

Every Defendant in this action moves the Court to dismiss all the claims brought by We The Patriots USA, Inc. and CT Freedom Alliance, LLC for lack of subject matter jurisdiction because they allegedly did not plead sufficient facts to support associational standing. **Dkt. 21-1, pp. 6-8; Dkt. 22-1, pp. 8-10; Dkt. 23-1, pp. 6-8.** The Court should deny these motions because the three individual Plaintiffs are members of both organizations, and the Defendants do not challenge their standing.

To determine whether an association has standing to maintain a suit to redress members' injuries, courts apply a three-part test. *Bano v. Union Carbide Corp.*, 361 F.3d 696, 713-14. First, members of the association must have standing to sue in their own right without the association's involvement. *Id*. at 713-14. Second, the interests that the

association seeks to protect are germane to its purpose. *Id*. at 713-14. Third, neither the claims asserted nor the relief requested requires the participation of individual members in the lawsuit. *Id*. at 713-14.

The Defendants' motions to dismiss are entirely predicated on their claims that We The Patriots USA, Inc. and CT Freedom Alliance, LLC did not plead specific enough facts to show at least one identified member has suffered or would suffer harm. While it is true that We The Patriots USA, Inc. and CT Freedom Alliance, LLC did not specifically identify members, the individual Plaintiffs are members of both organizations and have sued along with their organizations. They have clearly alleged in great detail how Public Act 21-6 injures them, and the Defendants do not challenge their standing.

The Court should avoid narrowly construing the pleadings as the Defendants invite it to do. Both We The Patriots USA, Inc. and CT Freedom Alliance, LLC have pled that "a significant number" and "most", respectively, of their members are Connecticut parents affected by the allegations that Plaintiffs Lora, Hidalgo, and Elidrissi assert. It takes no great leap of logic for the Court to conclude, as implied, that Plaintiffs Lora, Hidalgo, and Elidrissi are members of both We The Patriots USA, Inc and CT Freedom Alliance, LLC.

Thus, We The Patriots, Inc. and CT Freedom Alliance, LLC ask the Court to deny the Defendants' motions to dismiss their claims.

### III. The Court Should Deny The Defendants' Motions To Dismiss Count One Because The First Amendment Protects The Plaintiffs' Free Exercise Of Their Religion.

The Defendants present three nearly identical lines of attack on Count One. First, they argue that Supreme Court and Second Circuit precedent establishes a blanket public health exception to the First Amendment. **Dkt. 21-1, pp. 9-14; Dkt. 22-1, pp. 10-17; Dkt. 23-1, pp. 8-14.** Second, they argue that Conn. Gen. Stat. § 10-204a, as amended by

Public Act No. § 21-6, is a neutral law of general applicability subject only to rational basis review, which it satisfies. **Dkt. 21-1, pp. 14-20; Dkt. 22-1, pp. 17-23; Dkt. 23-1, pp. 14-20.** Third, they argue that, even if the Court were to subject Conn. Gen. Stat. § 10-204a to strict scrutiny, it would survive. **Dkt. 21-1, pp. 20-24; Dkt. 22-1, pp. 23-26; Dkt. 23-1, pp. 20-23.**

These arguments sorely miss the mark, and the Plaintiffs respond to each in turn below:

### A. Supreme Court precedent does not establish a public health exception to the First Amendment.

The Defendants claim that the Supreme Court's decisions in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), *Zucht v. King*, 260 U.S. 174 (1922), and *Prince v. Massachusetts*, 321 U.S. 158 (1944) as well as the Second Circuit's decision in *Philips v. City of New York*, 775 F.3d 538 (2d Cir. 2015) dispositively establish that mandatory school vaccination law are per se constitutional even when they seek to subjugate First Amendment rights. This claim seeks to establish a public health exception to the First Amendment, and it fails for three reasons.

First, the Supreme Court has clearly established that, even during a public health emergency, the First Amendment's prohibition on the attachment of special disabilities to religion still applies in full force. *See Harvest Rock Church, Inc. v. Newsom*, 141 S. Ct. 889(Mem) (Dec. 3, 2020) (granting certiorari and adopting *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) as its decision). If such a rule applies during a public health emergency, common sense dictates that it applies during ordinary circumstances as well. In other words, the Defendants' assertion of a public health

interest does not swallow the First Amendment even when it comes in the form of a school vaccine mandate.

Second, *Jacobson* and *Zucht* involved assertions of different rights than the ones that the Plaintiffs assert here. As Justice Gorsuch pointed out in his *Cuomo* concurrence and as *Jacobson* itself makes clear, Henning Jacobson only asserted a generalized Fourteenth Amendment liberty interest claim in *Jacobson*, not a First Amendment claim, a suspect classification claim, or a claim of a fundamental right. *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 70 (2020) (Gorsuch, J., concurring). Justice Gorsuch then makes the following observation:

> Put differently, *Jacobson* didn't seek to depart from normal legal rules during a pandemic, and it supplies no precedent for doing so. Instead, Jacobson applied what would become the traditional legal test associated with the right at issue—exactly what the Court does today. Here, that means strict scrutiny: The First Amendment traditionally requires a State to treat religious exercises at least as well as comparable secular activities unless it can meet the demands of strict scrutiny—showing it has employed the most narrowly tailored means available to satisfy a compelling state interest.

*Id*. at 70.

Likewise, in *Zucht v. King*, 260 U.S. 24 (1922), Rosalyn Zucht only asserted a generalized Fourteenth Amendment liberty claim against a school vaccination mandate and a vague equal protection claim. The *Zucht* Court relied on *Jacobson* to reject her claim.

In *Prince v. Massachusetts*, 321 U.S. 158 (1944), the Supreme Court expressly limited its decision to the facts of the case:

> Our ruling does not extend beyond the facts the case presents. We neither lay the foundation 'for any (that is, every) state intervention in the indoctrination and participation of children in religion' which may be done 'in the name of their health and welfare' nor give warrant for 'every limitation on their religious training and activities.' The religious training and indoctrination of children may be accomplished in many ways, some of

12

which, as we have noted, have received constitutional protection through decisions of this Court. These and all others except the public proclaiming of religion on the streets, if this may be taken as either training or indoctrination of the proclaimer, remain unaffected by the decision.
*Id*. at 171.

Thus, even though the *Prince* Court rejected the First Amendment claim and permitted Massachusetts to regulate child street preaching, it expressly instructed lower courts that its opinion did not purport to establish legal principles on any other issue. By the Supreme Court's own language, *Prince* has no controlling weight in this case.

Third, even if Justice Gorsuch's view of *Jacobson* is incorrect and *Jacobson* does stand for the proposition that vaccination mandates are per se a valid exercise of the state's police power, the Second Circuit's reliance on it and *Zucht* in *Philips* errs, and the Court should decline the Defendants' invitation to make such an error.

There is no question that the Fourteenth Amendment represented a drastic shift in American constitutional law. Before its ratification, the Supreme Court had clearly established that the Founders did not intend for the Bill of Rights to apply to state governments. *Barron v. Baltimore*, 32 U.S. (7 Pet.) 243 (1833). Thus, the states enjoyed a greater measure of sovereignty than they did after the ratification of the Fourteenth Amendment. In the thirty years before the ratification of the Fourteenth Amendment, there were strong political movements – primarily the abolition movement – that sought to subject state sovereignty to the individual rights protections guaranteed by the Bill of Rights. *See* Michael Kent Curtis, *The Bill of Rights As A Limitation On State Authority: A Reply To Professor Berger*, 16 Wake Forest L. Rev. 45 (1980). The framers of Fourteenth Amendment were abolitionists, and they intended to achieve the subjugation of state sovereignty to individual rights protections through the Fourteenth Amendment. *Id*.

The principal author of the Fourteenth Amendment, Representative John Bingham, elaborated on the Fourteenth Amendment after its ratification, referencing *Barron v. Baltimore* by name and stating as follows:

> Mr. Speaker, that the scope and meaning of the limitations imposed by the first section, fourteenth amendment of the Constitution may be more fully understood, permit me to say that the privileges and immunities of citizens of the United States, as contradistinguished from citizens of a State, are chiefly defined in the first eight amendment to the Constitution of the United States.

*Id*. at 85 (quoting Cong. Globe, 42d Cong., 1st Sess. App. 84 (1871)). Furthermore, another author of the Fourteenth Amendment, Senator Jacob Howard, explained that its Privileges or Immunities Clause guaranteed unenumerated rights like the Art. IV, Sec. 2 Privileges and Immunities Clause did. *See* Randy E. Barnett & Evan Bernick, *The Privileges or Immunities Clause Abridged: A Critique of Kurt Lash on the Fourteenth Amendment*, 95 Notre Dame L.R. 499, 500 (2019). Senator Howard explained that the Fourteenth Amendment was intended to protect unenumerated rights of the kind defined in *Corfield v. Coryell*, 6 F. Cas. 546, 551 (C.C.E.D. Pa. 123). *Id*. at 500 (citing Cong. Globe, 39th Cong., 1st Sess. 2765 (1866) (statement of Sen. Howard).

The Supreme Court declined to adopt the clear interpretation of the Fourteenth Amendment's Privileges or Immunities Clause as a vehicle for incorporation of the Bill of Rights and substantive due process in *The Slaughter-House Cases*, 83 U.S. 36 (1873). Over the late 1800s, the Supreme Court repeatedly rejected arguments aimed at achieving the Fourteenth Amendment's original purpose of incorporating the Bill of Rights against the states. *See, e.g.*, *United States v. Cruikshank*, 92 U.S. 542 (1876). The Supreme Court did not recognize incorporation as a constitutional doctrine until 1925 in *Gitlow v. New York*, 268 U.S. 652 (1925), and it did not recognize unenumerated rights

14

as being protected by the Fourteenth Amendment until *Lochner v. New York*, 198 U.S. 45 (1905). Furthermore, the Supreme Court did not even discuss modern constitutional scrutiny doctrines until 1938 in *United States v. Carolene Products Co.*, 304 U.S. 144, 152 n. 4 (1938), and it did not apply a form of scrutiny other than rational basis review until *Korematsu v. United States*, 323 U.S. 214 (1944).

Thus, when the Supreme Court decided *Jacobson*, it had not given full force and meaning to the precise nature of the Fourteenth Amendment. The controlling jurisprudence at the time meant that the Supreme Court did not examine unenumerated rights or enumerated rights guaranteed by the Fourteenth Amendment because it did not interpret the Fourteenth Amendment as protecting either form of individual rights. Even more notably, Henning Jacobson did not even attempt to assert claims under the Bill of Rights or some sort of unenumerated rights theory within the Fourteenth Amendment, relying wholly on the argument that the Fourteenth Amendment protected a form of generalized liberty.

The Supreme Court has never had the occasion to revisit the scope of *Jacobson* after it recognized the full scope of the Fourteenth Amendment and effected the fundamental change required by the Fourteenth Amendment in the dynamic between the state's police power and individual rights. The result is that *Jacobson* is out of place in modern constitutional jurisprudence and should not be given the force of controlling law.

An illustration of *Jacobson*'s place in modern constitutional jurisprudence readily presents itself. The CDC described HIV/AIDS as a global pandemic in 2006,[6] and it was

---

[6] https://www.cdc.gov/mmwr/preview/mmwrhtml/mm5531a1.htm

treated as a global pandemic since the 1980s.[7] According the CDC's statistics in 2018, gay and bisexual men accounted for 69% of new HIV diagnoses.[8] Despite HIV/AIDS being declared a global pandemic and the increased risk of the spread of HIV/AIDS among gays and bisexuals, the Supreme Court clearly established that states' police power does not permit them to criminalize homosexual intimacy, which is protected as a fundamental unenumerated right under the Fourteenth Amendment.[9] *Lawrence v. Texas*, 539 U.S. 558 (2003). If *Jacobson* controlled as a rule of law, it would undoubtedly permit states to prohibit conduct that would spread HIV/AIDS with the threat of criminal consequences. However, as the Supreme Court recognized in *Lawrence*, modern constitutional jurisprudence does not permit the state to classify fundamental rights – enumerated or unenumerated – as forbidden fruit at which a mere nibble will result in criminal consequences. The Supreme Court did not cite or discuss *Jacobson* once in its *Lawrence* opinion, and it did not address public health concerns either. *Lawrence v. Texas*, 539 U.S. 558 (2003).

*Lawrence* shows that *Jacobson* is out of place in modern constitutional jurisprudence and confirms its historical context as a pre-incorporation/unenumerated rights rule of law that has little to no application in modern constitutional jurisprudence. The Court should not give *Jacobson* and other decisions that rely on it dispositive weight over the Plaintiffs' Free Exercise claims, and it should instead apply modern constitutional jurisprudence to scrutinize the Defendants' restrictions as the Supreme Court itself has

---

[7] Michael H. Merson, *The HIV-AIDS Pandemic at 25 – The Global Response*, N. Engl. J. Med. (2006). https://www.nejm.org/doi/full/10.1056/nejmp068074
[8] https://www.cdc.gov/hiv/statistics/overview/ataglance.html
[9] Laurence H. Tribe, *Lawrence v. Texas: The "Fundamental Right" That Dare Not Speak Its Name*, 117 Harv. L. Rev. 1893 (2004).

done recently. *See, e.g.*, *Tandon v. Newsom*, 141 S. Ct. 1294 (Apr. 9, 2021); *Harvest Rock Church, Inc. v. Newsom*, 141 S. Ct. 889(Mem) (2020); *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020).

**B. Conn Gen. Stat. § 10-204a, as amended by Public Act No. 21-6 is not a law of general applicability, and the Court should review it under strict scrutiny.**

The analysis of First Amendment Free Exercise claims begins with an analysis of whether a law is neutral and of general applicability. *Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868, 1876 (Jun. 17, 2021). The Defendants argue that Conn. Gen. Stat. § 10-204a, as amended by Public Act No. 21-6, is neutral and of general applicability, thus requiring the Court to apply rational basis scrutiny. **Dkt. 21-1, pp. 14-20; Dkt. 22-1, pp. 17-23; Dkt. 23-1, pp. 14-20**. In doing so, all of the Defendants neglect the Supreme Court's recent decision in *Fulton*, which clearly indicates that Conn. Gen. Stat. § 10-204a is not neutral and of general applicability.[10] **Dkt. 21-1, pp. 14-20; Dkt. 22-1, pp. 17-23; Dkt. 23-1, pp. 14-20**.

"A law is not generally applicable if it invite[s] the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 141 S. Ct. at 1877 (internal quotation marks and citations omitted). "A law also lacks general applicability if it permits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id*. While it is true that all laws are somewhat selective, the Supreme Court has held that specific "categories of selection are of paramount concern when a law has the incidental

---

[10] Only the following proposed amici have addressed *Fulton's* impact: Americans United for Separation of Church and State, Central Conference of American Rabbis, Interfaith Alliance Foundation, Men of Reform Judaism, Reconstructionist Rabbinical Association, Union for Reform Judaism, and Women of Reform Judaism.

effect of burdening religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542 (1993).

At least one circuit court has previously held that the grant of a medical exemption, but not a religious exemption, violates the neutrality and general applicability requirements of the Free Exercise Clause. In *Fraternal order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359 (3rd Cir. 1999), now-Justice Samuel Alito held that a police department's medical exemptions from a shaving policy, but denial of religious exemptions, constituted a set of individualized exemptions within the meaning of *Lukumi*. Of particular concern to Justice Alito and his fellow Third Circuit judges was when "the government does not merely create a mechanism for individualized exemptions, but instead, actually creates a categorical exemption for individuals with a secular objection, but not for individuals with a religious objection." *Id*. at 365. Thus, they held that such a categorical distinction triggered strict scrutiny because the medical exemption undermined the government's interests in the same way that the religious exemption did. *Id*.

Additionally, in *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (Apr. 2021), the Supreme Court held that whether two activities or exemptions are comparable for purposes of a Free Exercise Clause analysis is determined by the risks that they pose, not the reasons for giving them.

Conn. Gen. Stat. § 10-204a, as amended by Public Act No. 21-6, provides for secular exemptions (medical) from its vaccination mandate while completely eliminating religious exemptions. The Defendants claim that such a distinction is neutral and generally applicable by framing their interest as broad as humanly possible – "the purpose

18

of §10-204a(a) is to protect the health and safety of Connecticut's school children." **Dkt. 21-1, p. 18; Dkt. 22-1, p. 20; Dkt. 23-1, p. 18.** Under this broad framework, the Defendants could justify nearly any type of categorical distinction between how it treats secular exemptions and religious exemptions as being neutral and of general applicability. Justice requires more specificity. Unlike their lawyers, the legislators who passed Public Act No. 21-6 struck a far narrower tone in defining the government interest at stake: preventing the spread of contagious disease. **Dkt. 22-3, pp. 4-5.**

Regardless of whether a child claims a medical or a religious exemption, they enter public or private schools in Connecticut unvaccinated and, in the Defendants' eyes, more likely to spread contagious disease than their peers regardless of the reason as to why they are unvaccinated. Disease, and the spread of disease, will not inquire as to their reasons for being exempt from the Defendants' vaccination requirement. As set forth in *Tandon*, the law does not inquire why either when considering which level of constitutional scrutiny to apply. The plain truth of the matter is that the Defendants consider all unvaccinated children to be a public health risk because of their increased likelihood to spread contagious disease.

To categorically discriminate on the basis of why when granting exemptions from its vaccination requirement render Conn. Gen. Stat. § 10-204a, as amended by Public Act 21-6, unneutral and not of general applicability. Thus, Supreme Court precedents require the application of strict scrutiny.

**C. Conn Gen. Stat. § 10-204a, as amended by Public Act No. 21-6, infringes on multiple rights secured by the federal constitution, thus requiring the Court to apply strict scrutiny.**

*Employment Div. v. Smith* clearly enumerates several situations that serve as exceptions to *Smith's* general applicability framework. 494 U.S. 872, 881 (1990). In these hybrid-rights situations, the Supreme Court has held that the First Amendment may bar the application of a generally applicable and neutral law. *Id*. While the Second Circuit has rejected such an interpretation of *Smith*, *see Leebart v. Harrington*, 332 F.3d 134, 144 (2d Cir. 2003), the Court must follow Supreme Court precedent before it follows Second Circuit precedent. As clearly stated in *Smith*, when an otherwise neutral, generally applicable law infringes on a parental right in addition to rights protected by the Free Exercise Clause, Supreme Court precedent clearly instructs that the proper method of analysis is strict scrutiny. *Id*. at 881-82 (holding that the right of parents to direct the education of their children is a hybrid-rights situation requiring an exception from *Smith*); *see also Wisconsin v. Yoder*, 406 U.S. 215 (1972).

The Plaintiffs assert precisely such a hybrid rights situation here. They have stated claims that Conn. Gen. Stat. § 10-204a, as amended by Public Act 21-6, violates their right to the free exercise of their religion and their right to direct the education of their children. *See* **Dkt. 1, ¶¶ 42-51, 62-65.** These claims are inextricably intertwined, and *Smith* requires that the Court apply strict scrutiny.

**D. *Employment Div. v. Smith* deviates from the text and history of the First Amendment, thus requiring the Court to apply strict scrutiny.**

If the Court declines to apply strict scrutiny on either basis articulated above, it should still apply strict scrutiny based on the First Amendment's text and history. The Free Exercise Clause establishes an affirmative right for people of faith to practice their

20

religion, not just hold a particular religious belief. On its face, this phrase "does not distinguish between laws that are generally applicable and law that target particular religious practices." *Employment Div. v. Smith*, 494 U.S. 872, 894 (O'Connor, J., concurring). Thus, if a law prohibits a religious practice (i.e., wearing a religious head covering in court), whether it prohibits analogous secular activities (a no hats policy) is irrelevant as a constitutional matter. The Founders explicitly considered such a scenario when they created the Free Exercise Clause. *See* Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion,* 103 Harv. L. Rev. 1409, 1471-1472 & n.320 (1990).

Under a historically and textually faithful constitutional analysis, courts must apply strict scrutiny to laws that burden the practice of religion, especially laws such as Public Act No. 21-6 that seek to banish people of faith from society. Thus, the Plaintiffs ask the Court to apply strict scrutiny based on the plain language of the First Amendment and its historical foundations.

### E. Conn Gen. Stat. § 10-204a, as amended by Public Act No. 21-6, cannot survive strict scrutiny.

Under a strict scrutiny analysis, a government defendant must show that the challenged law is narrowly tailored to further a compelling government interest. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 172 (2015). The Defendants fail to meet their burden on both elements.

First, the Defendants claim a compelling interest in preventing the spread of contagious disease by keeping vaccination rates above a certain threshold. The Defendants, however, undermine the compelling nature of their interest by allowing children mere months older than the Plaintiffs' children to keep their religious exemptions

from their vaccination mandate. **Dkt. 1, ¶ 17.** They also make no provision for an eventuality where medical exemptions could drive the vaccination rates among Connecticut school children below the threshold that they deem is necessary to protect the public health.

Second, the Defendants argue that they have narrowly tailored Public Act No. 21-6 by allowing school children possessing an existing religious exemption to keep their exemptions and assert that they could have constitutionally required those children to be vaccinated as well. The Defendants' disregard for the scope of the requirements of Conn. Gen. Stat. § 10-204a, as amended by Public Act No. 21-6, serves them ill here, and the scope alone proves fatal.

Conn. Gen. Stat. § 10-204a, as amended by Public Act No. 21-6, prohibits a child from attending public or private schools, daycares, and pre-schools unless that child receives the vaccinations required by the state of Connecticut. If the Defendants choose to enforce the provisions against parents who homeschool and report to their local school boards, the parents of a child who objects to taking a vaccine on religious grounds will be forced to choose between educating their children or abandoning their religious beliefs.

The sheer harshness of how far the Defendants have gone here cannot be overstated, and more than a few ways exist by which the Defendants could have more narrowly tailored their "solution." First, the Defendants articulated a concern that parents were exploiting the religious exemption system for improper purposes as the primary reason for passing Public Act No. 21-6. *See* **Dkt. 22-3, pp. 6-7.** The Defendants could have easily addressed that concern by reforming the religious exemption process by requiring parents to complete sworn statements explaining their religious beliefs and

requiring them to view a presentation on importance of taking vaccinations and common misconceptions about them. Second, the Defendants could have still afforded the Plaintiffs and similarly situated parents the ability to send their children to private schools, pre-schools, and daycares without being forced to choose between their faith and their children's futures, thus mitigating a substantial portion of the problem they perceived in public schools. Instead, the Defendants have rendered it impossible for the Plaintiffs to obtain educations for their children.

These alternatives – far less onerous than the one chosen by the Defendants – would have struck a middle ground between furthering the Defendants' interest in a far narrower, but effective fashion while respecting the Plaintiffs' religious beliefs. The Defendants' failure to select these alternatives or another form of an alternative dooms Conn. Gen. Stat. § 10-204a, as amended by Public Act No. 21-6 in a strict scrutiny analysis, and the Plaintiffs ask the Court to deny the Defendants' motions to dismiss Count One.

## IV. The Court Should Deny The Defendants' Motions To Dismiss Count Two Because Conn Gen. Stat. § 10-204a, as amended by Public Act No. 21-6, Violates The Plaintiffs' Rights To Privacy And Medical Freedom.

At the outset, the Defendants argue that *Jacobson* and *Philips* foreclose any claims of First, Fourth, Fifth, and Fourteenth Amendment rights to privacy and medical freedom. Their argument fails for the same reason that their argument regarding *Jacobson*'s foreclosure of their First Amendment claim does. As discussed previously, the state of federal constitutional law has changed dramatically since *Jacobson*, and, as Justice Gorsuch pointed out, courts must follow *Jacobson*'s approach to selecting levels of scrutiny and issuing rulings. Because *Philips* and the other Second Circuit cases that the

Defendants rely on blindly embrace *Jacobson* as dispositive for its holding instead of what it did, they cannot control this claim.

The Supreme Court unequivocally established a fundamental right to privacy in the First, Fourth, Fifth, Ninth, and Fourteenth Amendments in *Roe v. Wade* and prior decisions. *See Roe v. Wade*, 410 U.S. 113, 152-53 (1973). While its precedents only covered matters pertaining to marriage, procreation, contraception, family relationships, and child rearing and education, the *Roe* Court refrained from confining it to just those areas. *Id*. at 152-53. The *Roe* Court then elaborated on the medical nature of the decision that a woman must make on whether to elect an abortion:

> This right of privacy, whether it be founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action, as we feel it is, or, as the District Court determined, in the Ninth Amendment's reservation of rights to the people, is broad enough to encompass a woman's decision whether or not to terminate her pregnancy. The detriment that the State would impose upon the pregnant woman by denying this choice altogether is apparent. Specific and direct harm medically diagnosable even in early pregnancy may be involved. Maternity, or additional offspring, may force upon the woman a distressful life and future. Psychological harm may be imminent. Mental and physical health may be taxed by child care. There is also the distress, for all concerned, associated with the unwanted child, and there is the problem of bringing a child into a family already unable, psychologically and otherwise, to care for it. In other cases, as in this one, the additional difficulties and continuing stigma of unwed motherhood may be involved. All these are factors the woman and her responsible physician necessarily will consider in consultation.

*Id*. at 153.

The Supreme Court then reaffirmed its decision in *Planned Parenthood v. Casey*, 505 U.S. 833 (1992) and describe the choice on whether to get an abortion as one of the "most intimate and personal choices that a person may make in a lifetime, choices central to personal dignity and autonomy." *Id*. at 851. Although the *Casey* Court located the right

to an abortion under a Fourteenth Amendment liberty theory, it did not cast doubt on *Roe's* formulation of the right as a right to privacy. *Id*. at 852-853.

Under these decisions, the decision to terminate a pregnancy is inherently a private medical decision. While the *Roe* Court cited *Jacobson* for the proposition that the fundamental right to privacy did not completely remove conduct from state regulation, it held that states could only regulate the right when its interest became compelling and its regulations must be narrowly tailored. *Roe*, 410 U.S. at 154-56. In other words, *Roe* required state regulations to survive strict scrutiny.

If the right to elect a medical procedure to terminate the life of another being is a fundamental constitutional right, the right to decline a vaccination on behalf of one's children is also a fundamental constitutional right with similar roots in the Supreme Court's child-rearing precedents such as *Pierce v. Society of Sisters*, 268 U.S. 510, 535 (1925). *See also Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261 (1990) (holding that there is a fundamental constitutional right to refuse medical treatment). Like the right to abortion, the right to decline a vaccination is not an unlimited right, but one that is entitled to be protected by strict scrutiny.

As discussed previously, Conn. Gen. Stat. § 10-204a, as amended by Public Act No. 21-6, cannot survive strict scrutiny because there are ways where the Defendants can tailor their "solutions" for preventing the spread of contagious diseases to respect the Plaintiffs' rights while being equally effective. These solutions include still allowing the Plaintiffs to send their children to private schools, pre-schools, and daycares that may be more tolerant of their privacy rights. Thus, the Plaintiffs ask the Court to deny the Defendants' motions to dismiss.

25

**V. The Court Should Deny The Defendants' Motions To Dismiss Count Three Because Public Act No. 21-6 Creates Age-Based Classes In Violation Of The Equal Protection Clause Of The Fourteenth Amendment Because It Only Allows Parents And School Children To Freely Exercise Their Religious Beliefs Based On Their Age.**

Age is not a suspect classification on its own for Fourteenth Amendment Equal Protection Clause claims, thus allowing courts to review standalone age discrimination claims under rational basis scrutiny. *Gregory v. Ashcroft*, 501 U.S. 452, 470 (1990). When a state's age-based classification burdens the exercise of a fundamental right, however, the Fourteenth Amendment requires courts to employ strict scrutiny to decide age-based discrimination claims. *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 312-313 (1976).

The U.S. Supreme Court has already recognized that the free speech and freedom of association rights guaranteed by the First Amendment are fundamental for purposes of an Equal Protection Clause analysis. *Williams v. Rhodes*, 393 U.S. 23, 30-34 (1968); *see also Murgia*, 427 U.S. at 312 n.3. Supreme Court precedents firmly establish that the freedom to exercise one's religion is a fundamental constitutional right. *See Cantwell v. State of Connecticut*, 310 U.S. 296, 307 (1940) ("The fundamental law declares the interest of the United States that the free exercise of religion be not prohibited…"); *Wisconsin v. Yoder*, 406 U.S. 205, 214 (1972) (same). Thus, if Public Act No. 21-6 substantially burdens the Plaintiffs' First Amendment rights to freely exercise their religion based on an age-based classification, the Supreme Court's precedents require this Court to review the Plaintiffs' Equal Protection claims under strict scrutiny.

No one can dispute in good faith that Public Act No. 21-6 draws two lines. First, it prohibits parents and their children from asserting a religious objection to the vaccination requirements necessary to attend any school or daycare in Connecticut. Second, it draws

26

the first line on the basis of age by allowing all current kindergarten through twelfth grade students and their parents to assert their religious objections and still attend any school or daycare in Connecticut while denying the same right to children who were not old enough to attend kindergarten at the time of its passage.

Thus, two questions lie before the Court. First, do Public Act No. 21-6's age-based classifications substantially burden the Plaintiffs' exercise of a fundamental right? Second, do the Defendants have a compelling state interest for which they have narrowly tailored Public Act No. 21-6 to meet? The answers to both questions overwhelmingly establish Public Act No. 21-6's unconstitutionality under the Fourteenth Amendment's Equal Protection Clause.

First, Public Act No. 21-6 does not merely substantially burden the Plaintiffs' First Amendment right to freely exercise their religion. It completely prohibits them from freely exercising their religion and educating their children or obtaining daycare for them at the same time. The act's main evil is that every school, daycare, preschool, or other activity subject to state or local board of education regulation must require all students to be vaccinated unless they have a medical exemption. In other words, the Plaintiffs must choose between adhering to their religious convictions and securing their children's future by providing them with the education necessary to be contributing members of society because they cannot even turn to private institutions – let alone public ones – without discarding their religious beliefs.

The act's provisions also defy logic by allowing the parents of children who are mere months older than the Plaintiffs' children to maintain their religious exemptions to taking vaccines throughout their education. The act will allow children who were enrolled

in pre-school with a registered religious exemption to vaccination requirement before the act became law to keep their exemptions through grade 12, thus drawing an age-based line on who can assert a religious objection to taking a vaccine and receive an exemption. In other words, the Defendants now enforce a law that, in practical terms, says "if you were old enough at the time of this act becoming law, we will respect your religion. If not, too bad. Your religious convictions do not matter."

The burden to the Plaintiffs and every parent and child who is similarly situated cannot be overstated. The Defendants will, through Public Act No. 21-6, create a class of second-class citizens on the basis of their religious convictions. The Plaintiffs will face impossible odds to educate their children if they do not abandon their religious beliefs, and the consequences will devastate their children's futures by diminishing or completely depriving them of opportunities to attend college, obtain white-collar jobs, or be competitive for more career-driven blue-collar jobs. Their children will also face further difficulties in exercising their rights to vote, serve on juries, and participate in the basic functions of a self-governing society. In other words, the burden that Public Act No. 21-6 imposes on children who exercise their religious beliefs will have devastating lifelong consequences.

Second, the Defendants lack a compelling interest to discriminate against the Plaintiffs on the combined basis of age and religion, and they have practically conceded their lack of a compelling interest by the age-based classification that they drew. If the Defendants' interest truly lies in effectively guarding against a danger to public health

posed by religious objections to vaccinations,[11] the Defendants would have mandated that all children currently attending kindergarten through grade 12 be vaccinated despite their religious exemptions. The Defendants failed to create that mandate in Public Act No. 21-6. Instead, they allowed all children currently attending kindergarten through grade 12 with a religious exemption to keep their exemptions. In other words, every child currently enrolled in kindergarten through grade 12 with a religious exemption poses the same "danger" that the Plaintiffs' children supposedly do, and they will continue to pose that "danger" for another decade.

No compelling interest exists to justify allowing one class of children and their parents to freely exercise their religious beliefs and denying another class of children and their parents the right to freely exercise their religious beliefs because the children are too young. Thus, Public Act No. 21-6 perpetuates invidious discrimination that is just as unconstitutional as other forms of discrimination – e.g., race-based discrimination – that American courts have declared unconstitutional and abhorrent.

Third, assuming *arguendo* that the Defendants can assert some sort of compelling state interest, the Defendants have made no effort to narrowly tailor Public Act No. 21-6 to lessen the impact of invidious age discrimination. They have completely foreclosed any avenue for the Plaintiffs to obtain private daycare, pre-school, and primary and secondary education without waiving their religious beliefs. The Act makes no provision for private or public schools to offer remote learning on a permanent basis to parents and children who assert a religious objection to taking vaccines. It makes no provision for private or

---

[11] The Plaintiffs do not concede that the Defendants' interest in protecting public health outweighs their First Amendment right to freely exercise their religion under any circumstances.

29

public schools to offer separate, but equal facilities for parents and children who will not betray their faith by taking a vaccine.[12] In other words, viable alternatives exist that would allow the Defendants to fulfill their public health interests while permitting the Plaintiffs to enjoy the constitutional freedom that birthed the United States – the freedom to exercise their religion – which even the Defendants dared not touch for those children who are old enough to claim it. The Defendants, however, have completely disregarded these alternatives and have adopted a law that presents parents with an appalling choice: abandon their religious beliefs or watch their children be completely marginalized in society. Thus, under no circumstances, can Public Act 21-6 be said to have been narrowly tailored to meet a compelling state interest, and it must fail under constitutional scrutiny.

## VI. The Court Should Deny The Defendants' Motions To Dismiss Count Four Because Conn Gen. Stat. § 10-204a, As Amended By Public Act No. 21-6, Impermissibly Burdens The Plaintiffs' Fourteenth Amendment Right To Control The Rearing Of Their Children.

The Defendants have made one correct concession in their opposition to Count Four – the right to direct the rearing of a child is coextensive with the Plaintiffs' Free Exercise claim. **Dkt. 21-1, p. 32; Dkt. 22-1, p. 34; Dkt. 23-1, pp. 31-32**. This concession resolves any factual disagreement over whether a hybrid rights situation exists within the meaning of *Smith*, and the Court should bear the Defendants' confession in mind when deciding which level of scrutiny to apply in its consideration of Count One.

---

[12] If the Defendants struck this "yellow Star of David" course, the Supreme Court's decision in *Brown v Educ.*, 347 U.S. 483 (1954) would likely require the Court to declare it unconstitutional. The Plaintiffs, however, would rather incur the invidious discrimination created by *Plessy v. Ferguson*'s "separate but equal" doctrine rather than betray their faiths. 163 U.S. 537 (1896).

The Defendants' main defense to Count Four is that the Plaintiffs have failed to allege the violation of a fundamental constitutional right. The Defendants, however, cannot be more mistaken.

The Supreme Court left no doubt on whether the right of parents to direct their children was a fundamental constitutional right in *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000): "The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." This principle even finds itself in one of the decisions that the Defendants chiefly rely on: ""It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Prince v. Massachusetts,* 321 U.S. 158, 166 (1944).

The Defendants and at least one proposed amicus, Child USA, have sounded hysterical alarm bells that these precedents do not give parents the right to expose their children to harm, sinisterly suggesting that is what the Plaintiffs are trying to do. They vehemently accuse the Plaintiffs of treating their children as property as if the Plaintiffs are treating their children like cattle. Supreme Court precedent, however, cautions the opposite: "[T]he child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (1925) (striking down an Oregon law that compelled public school attendance). Responsibility and supreme authority for a child's well-being lies with that child's parents, and the Defendants may not supersede the parents' religious beliefs

in the name of protecting the child without a far more compelling and narrowly tailored reason that it advances in this case. *See Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972) (withholding the right of the Amish to withdraw their children from school after the eighth grade).

These precedents clearly establish that the Plaintiffs possess a fundamental right to control and otherwise direct the upbringing of their children, including opting to decline a medical treatment that violates their faith. Thus, any state regulation of such a right, including Conn. Gen. Stat. § 10-204a, as amended by Public Act No. 21-6, must survive strict scrutiny to be declared constitutional.

Conn. Gen. Stat. § 10-204a, as amended by Public Act No. 21-6, cannot survive strict scrutiny here for the reasons previously discussed, and the Plaintiffs ask the Court to deny the Defendants' motions to dismiss Count Four.

## VII. The Court Should Deny The State Agency Defendants' And The Stamford & Bethel Boards of Education's Motions To Dismiss Count Five Because The IDEA Requires Them To Provide Plaintiff Elidrissi's Eldest Child With A Free And Appropriate Public Education Because Of His Disability.

The State Agency Defendants' and the Stamford and Bethel[13] Boards of Education (the "IDEA Defendants" for purposes of this count only) move to dismiss Plaintiff Elidrissi's claims on behalf of her eldest son on the grounds that she has not pled enough facts to establish that he is disabled within the meaning of the Individuals with Disabilities Education Act (IDEA) and that the IDEA does not preempt Conn. Gen. Stat. § 10-204a, as amended by Public Act No. 21-6.

---

[13] Plaintiff Elidrissi did not name the Bethel Board of Education as a Defendant to Count Five. Thus, the Bethel Board of Education's participation in the effort to dismiss her claim is wholly inappropriate. *See* **Dkt. 23-1, p. 33** (failing to delineate the motion to dismiss as only being made by the Stamford Board of Education).

The IDEA Defendants' first contention fails as Plaintiff Elidrissi has pled that her son has a speech and learning disorder for which he now receives special services. **Dkt. 1, ¶¶ 40.** The IDEA defines "a child with a disability" as a child who has "speech or language impairments" or "specific learning disabilities; and who by reason thereof, need special education and related services." 20 U.S.C. § 1401(3)(A)(i)-(ii)). These allegations, short and plain as required by Fed. R. Civ. P. 8, clearly plead enough facts to establish that Plaintiff Elidrissi's son is disabled within the meaning of the IDEA.

The IDEA Defendants' second contention fails because they have barred disabled students from obtaining the critical services that the IDEA guarantees them. *See* 20 U.S.C. §§ 1400(c), (d); 1412(a); and 1415. The IDEA requires states that receive federal funding to provide children with a free and appropriate public education (FAPE), which includes special education and related services that are provided at public expense free of charge and include an appropriate preschool, elementary, or secondary school. 20 U.S.C. §§ 1401(9), 1412(a), and 1415. It also requires states to provide special needs services including speech-language pathology services and psychological services. 20 U.S.C. § 1401(26)(A).

The provision of these services is simply not enough under federal law. States must also provide them in the least restrictive environment:

> To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A). This least restrictive setting requires that a child's "special education and related services must be provided in the least restrictive setting consistent with a child's needs." *E.S. ex rel. B.S. v. Katonah-Lewisboro Sch. Dist.*, 487 Fed. Appx. 619, 621 (2d Cir. 2012). Finally, each child eligible for services under the IDEA must be provided with an individualized education plan (IEP) that is professionally prepared to meet a child's specific needs. 20 U.S.C. § 1414(d)(1)(A).

The IDEA does not permit states to attach conditions of attendance to disabled students attending school or receiving services, especially when it comes to their religious beliefs. This case presents a conflict between the IDEA and Conn. Gen. Stat. § 10-204a, as amended by Public Act No. 21-6. In the case of such a conflict, Conn. Gen. Stat. § 10-204a, as amended by Public Act No. 21-6 must yield under the Supremacy Clause of Article VI of the United States Constitution.

States may implement minimum guidelines that the IDEA establishes but they cannot implement limitations more restrictive than what the IDEA establishes when it comes to deciding who may access a free and appropriate public education under federal law. *See Evans v. Evans*, 818 F. Supp. 1215, 1223 (N.D. Ind. 1993). Conn. Gen. Stat. § 10-204a, as amended by Public Act No. 21-6 commits precisely such an error by limiting access to a free and appropriate public education in a way that the IDEA does not by establishing a vaccination requirement.

The IDEA Defendants urge the Court to shift the blame for Plaintiff Elidrissi's child being denied the services he is entitled to by federal law to Plaintiff Elidrissi by holding that she has made an affirmative choice to opt out of the services. Such an argument strains logic and places blame on a woman of faith who simply wishes to get her son the

services that he desperately needs while raising him in her Muslim faith. Plaintiff Elidrissi has not affirmatively opted out of any educational program. The IDEA Defendants are denying her and her disabled son access to those programs because of their faith. The IDEA does not permit them to do so, and Plaintiff Elidrissi asks the Court to deny the IDEA Defendants' motions to dismiss Count Five.

## **CONCLUSION**

Religion is the backbone of America. It sustains its citizens and shapes future upstanding citizens. The Defendants' brazen effort to force the Plaintiffs to choose between their faiths and their children's future violates the very fabric of freedom on which America stands. Thus, for all these reasons, the Plaintiffs ask the Court to deny the Defendants' motions to dismiss in their entirety.

THE PLAINTIFFS

/s/ Norman A. Pattis /s/
NORMAN A. PATTIS, ESQ.
PATTIS & SMITH, LLC
383 Orange Street
New Haven, CT 06511
Tel:  (203) 393-3017
Fax: (203) 393-9745
npattis@pattisandsmith.com
Fed Bar. No.: ct13120


/s/ Brian D. Festa /s/
BRIAN D. FESTA, ESQ.
General Counsel
CT Freedom Alliance, LLC
123 Farmington Ave., Ste. 175
Bristol, CT 06010
Tel: (860) 261-5605
brian@ctfreedomalliance.com
Fed. Bar. No.: ct30963

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 9, 2021 a copy of the foregoing was filed electronically. Notice of this filing was sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. .

/s/ NORMAN A. PATTIS /s/
NORMAN A. PATTIS, Esq.