# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| **WE THE PATRIOTS USA, INC., et al.,** | |
| *Plaintiffs*, | |
| **v.** | **Case No. 3:21-cv-00597-JBA** |
| **CONNECTICUT OFFICE OF EARLY CHILDHOOD DEVELOPMENT, et al.,** | **August 5, 2021** |
| *Defendants*. | |

**BRIEF, IN SUPPORT OF DEFENDANTS' MOTIONS TO DISMISS, OF *AMICI CURIAE* AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE, CENTRAL CONFERENCE OF AMERICAN RABBIS, INTERFAITH ALLIANCE FOUNDATION, MEN OF REFORM JUDAISM, RECONSTRUCTIONIST RABBINICAL ASSOCIATION, UNION FOR REFORM JUDAISM, AND WOMEN OF REFORM JUDAISM**

# TABLE OF CONTENTS

**Page(s)**

Interests of *Amici Curiae* ...................................................................................................1

Introduction and Summary of Argument.............................................................................1

Argument .............................................................................................................................3

I.    The courts have long rejected religion-based requests for exemptions from
vaccination requirements ...........................................................................................3

II.    The vaccination statute's medical exemption does not render Connecticut's
removal of the religious exemption unconstitutional .................................................7

      A.    The medical exemption does not trigger strict scrutiny.................................7

      B.    Even if the medical exemption triggered strict scrutiny, Connecticut's
vaccination statute would pass muster.........................................................12

Conclusion .........................................................................................................................14

## INTERESTS OF *AMICI CURIAE*

*Amici* are religious and civil-rights organizations that share a commitment to preserving the constitutional principles of religious freedom and the separation of religion and government. They believe that the right to exercise religion freely is precious, but that it was never intended to override protections for people's safety and health. *Amici* therefore oppose Plaintiffs' attempt to use the First Amendment's Free Exercise Clause to mandate a religious exemption from Connecticut's vaccination requirements for school attendance.

The *amici* are:

- Americans United for Separation of Church and State.

- Central Conference of American Rabbis.

- Interfaith Alliance Foundation.

- Men of Reform Judaism.

- Reconstructionist Rabbinical Association.

- Union for Reform Judaism.

- Women of Reform Judaism.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Vaccination of children—"one of the most significant public health interventions of all time"—safeguards individual children's health and protects the community against the spread of infectious disease. *E.g.*, Eileen Wang et al., *Nonmedical Exemptions from School Immunization Requirements: A Systematic Review*, 104 AM. J. PUB. HEALTH e62, e62 (2014), https://bit.ly/3z06FQE. Childhood vaccinations have prevented more than one hundred million cases of severe disease since 1924. *See* Lawrence O. Gostin, *Law, Ethics, and Public Health in the Vaccination Debates*, JAMA Online, at E1 (Feb. 12, 2015), https://bit.ly/3CiOXcL. Accordingly, all fifty states impose vaccination requirements on children attending schools. *Id.*

But in recent years, anti-vaccination sentiment has led to resurgences of dangerous diseases such as measles, mumps, and pertussis. *E.g.*, Olivia Benecke & Sarah E. DeYoung, *Anti-Vaccine Decision-Making and Measles Resurgence in the United States*, 6 GLOB. PEDIATRIC HEALTH 1, 1 (2019), https://bit.ly/3pilaup. Thus, after vaccination rates in Connecticut declined—and in many schools fell below the threshold needed to prevent outbreaks of measles—the Connecticut legislature enacted a law phasing out the religious exemption to the state's school-vaccination statute. *See* State Agency Defs.' Mem. Supp. Mot. to Dismiss (Doc. 22-1) at 3–5 and exhibits cited therein.

Plaintiffs challenge this legislation, contending that the Free Exercise Clause entitles them to a religious exemption from the vaccination statute. That is not so.

The Supreme Court and lower courts have long upheld vaccination requirements in the face of constitutional challenges, including arguments based on the freedom of religion. And under Supreme Court precedent, neutral, generally applicable laws enacted without discriminatory intent toward religion do not violate the Free Exercise Clause. Connecticut's amended vaccination statute complies with this standard because it will apply to all students who can be vaccinated safely.

The amended statute is not rendered unconstitutional by its continued allowance of a medical exemption from vaccination requirements. Nonreligious exemptions to a law do not require a religious exemption when the nonreligious exemptions advance the governmental interests served by the law, or at least do not undermine those interests as much as a religious exemption would. Here, far from undermining the governmental interest underlying the statute—protecting people's health—the medical exemption supports it. A religious exemption would not.

The Court should grant Defendants' motions to dismiss.

**ARGUMENT**

I.      **The courts have long rejected religion-based requests for exemptions from vaccination requirements.**

Religious freedom is a value of the highest order. But as the Supreme Court recently reaffirmed, the constitutional guarantee of religious freedom does not confer on religious objectors "a general immunity from secular laws." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020). The Supreme Court and lower courts thus have repeatedly rejected religion-based challenges to vaccination requirements.

More than a century ago, in *Jacobson v. Massachusetts*, 197 U.S. 11, 25 (1905), the Court upheld a mandatory-vaccination law aimed at stopping the spread of smallpox. The Court "[did] not perceive that this legislation ha[d] invaded *any* right secured by the Federal Constitution." *Id.* at 38 (emphasis added). And the Court explained that "[r]eal liberty for all could not exist under the operation of a principle which recognizes the right of each individual person to use his own [liberty] . . . regardless of the injury that may be done to others." *Id.* at 26. The Court thus straightforwardly rejected the view that the Constitution bars compulsory measures to protect the public health, recognizing instead the "fundamental principle that 'persons and property are subjected to all kinds of restraints and burdens in order to secure the . . . health . . . of the state.'" *Id.* (quoting *Hannibal & St. Joseph R.R. Co. v. Husen*, 95 U.S. 465, 471 (1877)). For "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Id.* at 27.

Likewise, in *Zucht v. King*, 260 U.S. 174, 175 (1922), the Court rejected a Fourteenth Amendment challenge to a San Antonio ordinance prohibiting children from attending public or private schools without proof of vaccination. The Court explained that "[l]ong before this suit was instituted" *Jacobson* had upheld the state's power to require vaccinations. *Id.* at 176. The

Court therefore concluded that "the constitutional question presented . . . was not . . . substantial in character." *Id.*

Although *Jacobson* and *Zucht* did not specifically consider a Free Exercise Clause argument, perhaps because the Clause had not yet been held applicable to the States, several of the Court's subsequent decisions have recognized that the principles set forth in them apply in the free-exercise context as in all others. In *Prince v. Massachusetts,* 321 U.S. 158, 166 (1944), for example, the Court explained that one "cannot claim freedom from compulsory vaccination . . . on religious grounds." For the "right to practice religion freely does not include liberty to expose the community . . . to communicable disease." *Id.* at 166–67.

In *Sherbert v. Verner*, 374 U.S. 398, 402–03 (1963), the Court, citing *Jacobson* and *Prince*, noted that it "has rejected challenges under the Free Exercise Clause to governmental regulation of certain overt acts prompted by religious beliefs or principles" when "[t]he conduct or actions so regulated have invariably posed some substantial threat to public safety, peace or order." In *Wisconsin v. Yoder*, 406 U.S. 205, 230 (1972), the Court underscored that free-exercise claims are denied when "harm to the physical or mental health . . . or to the public safety, peace, order, or welfare has been demonstrated or may be properly inferred." In explaining that foundational principle, the Court specifically pointed (*id.* at 230 & n.20) not just to *Jacobson* but also to a case expressly rejecting a free-exercise challenge to a mandatory-vaccination law, *Wright v. DeWitt Sch. Dist. No. 1*, 385 S.W.2d 644 (Ark. 1965). And in *Employment Division v. Smith*, the Court reaffirmed that the Free Exercise Clause does not "require[] religious exemptions from . . . health and safety regulation such as . . . compulsory vaccination laws." 494 U.S. 872, 888–89 (1990) (citing *Cude v. State*, 377 S.W.2d 816 (Ark. 1964)).

4

*Smith* also altered the legal standard for free-exercise claims in a manner that hampers religion-based challenges to vaccination mandates such as Connecticut's even more. In pre-*Smith* cases, such as *Sherbert*, 374 U.S. at 403–09, and *Yoder*, 406 U.S. at 215–19, the Supreme Court had been of the view that a law that substantially burdens religious exercise must serve a compelling governmental interest through narrowly tailored means. But *Smith* changed the legal landscape by holding that laws do not violate the Free Exercise Clause when they are neutral toward religion and apply generally, even if they substantially burden religion. *See* 494 U.S. at 878–79. As Justice Scalia explained for the Court, to "h[o]ld that an individual's religious beliefs excuse him from compliance with an otherwise valid law" would make "'professed doctrines of religious belief superior to the law of the land, and in effect . . . permit every citizen to become a law unto himself.'" *Id.* (quoting *Reynolds v. United States*, 98 U.S. 145, 166–67 (1879)).

Following both *Smith* and the Supreme Court's pre-*Smith* precedents, the Second Circuit and many other courts have ruled that the Free Exercise Clause does not require religious exemptions from vaccination requirements. In *Phillips v. City of New York*, 775 F.3d 538 (2d Cir. 2015), the Second Circuit held that a school district did not violate the Free Exercise Clause by temporarily excluding from school, as a result of a chicken-pox outbreak, children who had religious exemptions from New York State's vaccine requirements. The court explained that "New York could constitutionally require that all children be vaccinated in order to attend public school," and that the state had "go[ne] beyond what the Constitution requires by allowing an exemption for parents with genuine and sincere religious beliefs." *Id.* at 543. Likewise, in *Nikolao v. Lyon*, 875 F.3d 310, 316 (6th Cir. 2017), rejecting a free-exercise challenge to Michigan's procedures for obtaining a religious exemption from vaccination requirements for schoolchildren, the Sixth Circuit observed that "[c]onstitutionally, [the plaintiff] has no right to an exemption." And in *Workman v. Mingo County Board of Education*, 419 F. App'x 348, 353

(4th Cir. 2011), the Fourth Circuit denied a free-exercise challenge to West Virginia's vaccination requirements for school attendance, noting that "the state's wish to prevent the spread of communicable diseases clearly constitutes a compelling interest." Numerous federal district courts and state courts have issued similar rulings.[1]

Application of *Smith*'s rule that neutral, generally applicable laws do not violate the Free Exercise Clause confirms that there is no basis to deviate from these precedents with respect to Connecticut's vaccination statute. *Smith*'s neutrality requirement means that a law must not "infringe upon or restrict practices because of their religious motivation." *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 533 (1993). General applicability is the closely related concept that government, "in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief." *Id.* at 531, 543. The touchstone

---

[1] *See, e.g.*, *Klaassen v. Trustees of Ind. Univ.*, __ F. Supp. 3d __, No. 1:21-cv-238, 2021 WL 3073926, at *25 (N.D. Ind. July 18, 2021), *motion for injunction pending appeal denied*, __ F.4th __, No. 21-2326, 2021 WL 3281209 (7th Cir. Aug. 2, 2021); *W.D. v. Rockland County*, __ F. Supp. 3d __, No. 7:19-cv-2066, 2021 WL 707065, at *22–31 (S.D.N.Y. Feb. 22, 2021), *appeal docketed*, No. 21-551 (2d Cir. Mar. 9, 2021); *Whitlow v. California*, 203 F. Supp. 3d 1079, 1085–87 (S.D. Cal. 2016); *Boone v. Boozman*, 217 F. Supp. 2d 938, 953–55 (E.D. Ark. 2002); *McCarthy v. Boozman*, 212 F. Supp. 2d 945, 948 (W.D. Ark. 2002); *Sherr v. Northport-E. Northport Union Free Sch. Dist.*, 672 F. Supp. 81, 88 (E.D.N.Y. 1987); *F.F. v. State*, 143 N.Y.S.3d 734, 741–42 (N.Y. App. Div. 2021), *petition for review filed*, No. 21-82 (N.Y. 2021); *C.F. v. N.Y.C. Dep't of Health & Mental Hygiene*, 139 N.Y.S.3d 273, 287–92 (N.Y. App. Div. 2020); *Brown v. Smith*, 235 Cal. Rptr. 3d 218, 224–25 (Cal. Ct. App. 2018); *Davis v. State*, 451 A.2d 107, 112 & n.8 (Md. 1982); *Wright*, 385 S.W.2d at 646–48; *Cude*, 377 S.W.2d at 819; *Bd. of Educ. v. Maas*, 152 A.2d 394, 405–08 (N.J. Super. Ct. App. Div. 1959), *aff'd mem.*, 158 A.2d 330 (N.J. 1960); *State ex rel. Dunham v. Bd. of Educ.*, 96 N.E.2d 413, 413 (Ohio 1951); *Sadlock v. Bd. of Educ.*, 58 A.2d 218, 222 (N.J. 1948); *Middleton v. Pan*, No. 2:16-cv-5224, 2016 WL 11518596, at *2, 7 (C.D. Cal. Dec. 15, 2016), *report and recommendation adopted*, 2017 WL 10543984 (C.D. Cal. July 13, 2017); *Schenker v. County of Tuscarawas*, No. 5:12-cv-1020, 2012 WL 4061223, at *12 (N.D. Ohio Sept. 14, 2012); *Brock v. Boozman*, No. 4:01-cv-760, 2002 WL 1972086, at *5–8 (E.D. Ark. Aug. 12, 2002); *cf. Brown v. Stone*, 378 So. 2d 218, 223 (Miss. 1979) (holding that religious exemption to Mississippi vaccination statute not only was not required by Free Exercise Clause but also violated Equal Protection Clause because it "would discriminate against the great majority of children whose parents have no such religious convictions").

in both inquiries is whether government has discriminated against religious conduct. *See id.* at 533–34, 542–43.

Connecticut's amended vaccination statute easily satisfies these standards. Plaintiffs' complaint does not allege that the statute is motivated by any anti-religious animus. Indeed, far from discriminating against religion, the statute favors religious objectors by permitting students who were enrolled in kindergarten or a higher grade as of April 28, 2021, to keep any religious exemption they had received by that date. *See* Conn. Gen. Stat. § 10-204a(b). And excluding those who are covered by this grandfather clause, the statute applies equally to all students who can safely be vaccinated, regardless of whether they or their parents may object to vaccination on religious or nonreligious grounds. *See id.* §§ 10-204a(a), (c).[2]

## II. The vaccination statute's medical exemption does not render Connecticut's removal of the religious exemption unconstitutional.

### A. The medical exemption does not trigger strict scrutiny.

Plaintiffs' main argument appears to be that the retention of a medical exemption in the vaccination statute (*id.* § 10-204a(a)) renders the phase-out of the religious exemption unconstitutional. *See* Compl. (Doc. 1) ¶¶ 46–48. But the vast majority of the above-cited decisions rejecting challenges to vaccination mandates noted that a medical exemption was

---

[2] Plaintiffs do not contend in their complaint that the grandfather clause triggers strict scrutiny under the Free Exercise Clause. *See* Compl. (Doc. 1) ¶¶ 42–51. Nor could they successfully so argue. Because the grandfather clause benefits religious objectors only, it does not discriminate against religion. *See 303 Creative LLC v. Elenis*, __ F.4th __, No. 19-1413, 2021 WL 3157635, at *16 (10th Cir. July 26, 2021); *cf. Lukumi*, 508 U.S. at 532. And because the sole classification that the grandfather clause creates is based on when a religious exemption was obtained, the clause does not discriminate among religions. *Cf. Lukumi*, 508 U.S. at 532; *Larson v. Valente*, 456 U.S. 228, 245 (1982).

available. *See Jacobson*, 159 U.S. at 12, 38–39; *Phillips*, 775 F.3d at 540; *Nikolao*, 875 F.3d at 313; *Mingo*, 419 F. App'x at 351.[3]

Nor do the Supreme Court's recent decisions in *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021), or *Tandon v. Newsom*, 141 S. Ct. 1294 (2021) (per curiam), call for a different result. In *Fulton*, the Court noted that "[a] law . . . lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." 141 S. Ct. at 1877; *accord Cent. Rabbinical Cong. v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 197 (2d Cir. 2014). In *Tandon*, the Court stated that "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise" and that "whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." 141 S. Ct. at 1296.

These statements in *Fulton* and *Tandon* adopted views of the law that were previously set forth in two influential Third Circuit opinions by then-Judge Alito, *Fraternal Order of Police Newark Lodge No. 12 v. Newark*, 170 F.3d 359 (3d Cir. 1999), and *Blackhawk v. Pennsylvania*, 381 F.3d 202 (3d Cir. 2004). Justice Alito wrote in *Blackhawk*, "A law fails the general applicability requirement if it burdens a category of religiously motivated conduct but exempts or does not reach a substantial category of conduct that is not religiously motivated and that undermines the purposes of the law to at least the same degree as the covered conduct that is religiously motivated." 381 F.3d at 209; *accord Fraternal Ord.*, 170 F.3d at 364–66.

---

[3] *See also Klaassen*, __ F. Supp. 3d __, 2021 WL 3073926, at *6; *W.D.*, __ F. Supp. 3d __, 2021 WL 707065, at *22; *Whitlow*, 203 F. Supp. 3d 1083, 1086; *Boone*, 217 F. Supp. 2d at 942 n.6; *Sherr*, 672 F. Supp. at 87; *F.F.*, 143 N.Y.S.3d at 742; *C.F.*, 139 N.Y.S.3d at 292; *Brown v. Smith*, 235 Cal. Rptr. 3d at 221; *Maas*, 152 A.2d at 398; *Brown v. Stone*, 378 So. 2d at 219; *Sadlock*, 58 A.2d at 219; *Middleton*, 2016 WL 11518596, at *2; *Brock*, 2002 WL 1972086, at *5–8.

Justice Alito's *Fraternal Order* and *Blackhawk* opinions provide detailed guidance for distinguishing exemptions that undermine the governmental interests at stake from those that do not. In *Fraternal Order*, the court ruled that a police department's refusal to grant its officers a religious exemption from a prohibition on beards triggered heightened scrutiny under the Free Exercise Clause, because the department exempted officers from that prohibition for medical reasons, and the medical exemption undermined the governmental interest supporting the prohibition—"fostering a uniform appearance"—just as much as a religious exemption would. *See* 170 F.3d at 366. In *Blackhawk*, the court concluded that a state's denial of a religious exemption from a fee requirement for keeping exotic wildlife was subject to strict scrutiny because exemptions provided to zoos and circuses undermined the state interests at issue— raising money and discouraging the keeping of wild animals in captivity—to the same extent as would a religious exemption. *See* 381 F.3d at 211.

By contrast, explained Justice Alito in *Fraternal Order* and *Blackhawk*, the denial of a religious exemption in *Smith* from a law banning possession of controlled substances did not trigger strict scrutiny even though the law contained an exemption for medical uses: "The purpose of drug laws is to protect public health and welfare," but "when a doctor prescribes a drug, the doctor presumably does so to serve the patient's health and in the belief that the overall public welfare will be served." *Blackhawk*, 281 F.3d at 211; *accord Fraternal Ord.*, 170 F.3d at 366. "Therefore, the prescription exception in *Smith* did not undermine the purpose of the state's drug laws." *Blackhawk*, 281 F.3d at 211; *accord Fraternal Ord.*, 170 F.3d at 366. Similarly, Justice Alito noted that an exemption from the no-beard policy in *Fraternal Order* for undercover officers did not "undermine the [police] Department's interest in uniformity because undercover officers 'obviously are not held out to the public as law enforcement person[nel].'" 170 F.3d at 366 (citing a brief; alterations in original); *accord Blackhawk*, 281 F.3d at 211.

Justice Alito summed up the differences between exemptions that trigger strict scrutiny and those that do not as follows: "The prescription exception [in *Smith*] and the undercover exception [in *Fraternal Order*] do not trigger heightened scrutiny because the Free Exercise Clause does not require the government to apply its laws to activities that it does not have an interest in preventing." *Fraternal Ord.*, 170 F.3d at 366. "However, the medical exemption [in *Fraternal Order*] raises concern because it indicates that the [police] Department has made a value judgment that secular (i.e., medical) motivations for wearing a beard are important enough to overcome its general interest in uniformity but that religious motivations are not." *Id.*

The medical exemption in Connecticut's vaccination statute is similar to the medical exemption in *Smith* and the undercover exemption in *Fraternal Order*. Indeed, far from undermining the interests behind Connecticut's vaccination statute, the medical exemption advances them. Like the drug law upheld in *Smith*, the purpose of vaccination laws (*e.g.*, Wang, *supra*, at e62) "is to protect public health and welfare" (*Blackhawk*, 281 F.3d at 211). Just as is the case "when a doctor prescribes a drug," when a doctor certifies that it is medically contraindicated to vaccinate a child (as required to obtain the medical exemption, s*ee* Conn. Gen. Stat. § 10-204a(a)), "the doctor presumably does so to serve the patient's health and in the belief that the overall public welfare will be served" (*Blackhawk*, 281 F.3d at 211).

Moreover, forcing vaccinations on those who cannot safely be vaccinated is obviously something that "the government . . . does not have an interest in" (*Fraternal Ord.*, 170 F.3d at 366). The Supreme Court explained in *Jacobson* that it "would be cruel and inhuman in the last degree"—and likely unconstitutional—to require vaccination of a person "if it be apparent or can be shown with reasonable certainty that he is not at the time a fit subject of vaccination, or that vaccination, by reason of his then condition, would seriously impair his health, or probably cause

his death." 197 U.S. at 39. All fifty states therefore grant medical exemptions from their vaccination requirements. *See* Wang, *supra*, at e62.

In addition, even if the medical exemption could be construed as undermining the state interests at stake, it certainly does not do so "to at least the same degree as the covered conduct that is religiously motivated." *Cf. Blackhawk*, 381 F.3d at 209. For the number of Connecticut students who claimed religious exemptions during the 2019–20 schoolyear was more than ten times higher than the number who claimed medical exemptions. *See* Compl. Ex. D (Doc. 1-4) at 4. Thus, permitting a religious exemption poses a much greater threat to the state's interest in preventing the spread of disease than does allowing a medical exemption. And that threat is magnified by the tendency of religious objectors to vaccination to cluster in particular communities. *See* Thomas May & Ross D. Silverman, *'Clustering of exemptions' as a collective action threat to herd immunity*, 21 VACCINE 1048, 1050 (2003), https://bit.ly/2TJONcX. Such clustering can lead to outbreaks of dangerous diseases, by causing the percentage of people who are vaccinated in a community to fall below the "herd immunity" level—the level necessary to prevent a disease from circulating. *See id.* at 1048–50. In Connecticut, for example, clustering caused 120 schools to fall below the vaccination level needed for herd immunity against measles during the 2019–20 schoolyear. *See* State Agency Defs.' Mem. Supp. Mot. to Dismiss (Doc. 22) at 4 and citations therein.

In sum, Connecticut has no real choice other than to allow medical exemptions. And religious exemptions threaten the state's efforts to prevent spread of disease much more than medical exemptions do, while also not serving the interest in protecting student health that an exemption for those whose medical condition prevents them from being vaccinated does. Hence, the state's decision to retain medical exemptions but phase out religious exemptions in no way reflects "a value judgment in favor of secular motivations, but not religious motivations." *Cf.*

*Fraternal Ord.*, 170 F.3d at 366. The medical exemption therefore does not trigger strict scrutiny under the Free Exercise Clause.

> **B.     Even if the medical exemption triggered strict scrutiny, Connecticut's vaccination statute would pass muster.**

Even if strict scrutiny were to apply, Connecticut's vaccination statute would satisfy the test. "A government policy can survive strict scrutiny only if it advances 'interests of the highest order' and is narrowly tailored to achieve those interests." *Fulton*, 141 S. Ct. at 1881 (quoting *Lukumi*, 508 U.S. at 546). Just as secular exemptions may sometimes trigger strict scrutiny, so too they may sometimes prevent laws from surviving that review, whether by signifying that the government's interest is not truly compelling or by showing that the government's means are not adequately tailored. *See, e.g.*, *Fulton*, 141 S. Ct. at 1881–82; *Tandon*, 141 S. Ct. at 1296–97. And just as Justice Alito's opinions for the Third Circuit illuminate how to distinguish exemptions that trigger strict scrutiny from those that do not, a circuit-court opinion by then-Judge Gorsuch—*Yellowbear v. Lampert*, 741 F.3d 48 (10th Cir. 2014)—illuminates how to distinguish exemptions that fail strict scrutiny from those that pass it.

In *Yellowbear*, Justice Gorsuch considered a prison inmate's claim under the Religious Land Use and Institutionalized Persons Act, a statute that subjects governmental conduct that substantially burdens inmates' religious exercise to a strict-scrutiny test similar to the one used when strict scrutiny applies under the Free Exercise Clause. *See id.* at 56 (citing 42 U.S.C. § 2000cc–1(a)). Justice Gorsuch recognized that "[a] law's underinclusiveness—its failure to cover significant tracts of conduct implicating the law's animating and putatively compelling interest—can raise with it the inference that the government's claimed interest isn't actually so compelling after all." *Id.* at 60.

But, cautioned Justice Gorsuch, "it is important to acknowledge that inferences like these are not inevitable or irrebuttable." *Id.* at 61. "We know that few statutes pursue a single purpose

12

at any cost, without reference to competing interests," he explained. *Id.* "Given this, it would be odd if the mere fact that a law contains some secular exceptions always sufficed to prove the government lacked a compelling interest in avoiding another exception to accommodate a claimant's religious exercise." *Id.* "If that were the case, the compelling interest test would seem nearly impossible to satisfy." *Id.*

Instead, noted Justice Gorsuch, "[a] government can rebut an argument from underinclusion by showing that it hasn't acted in a logically inconsistent way—by (say) identifying a qualitative or quantitative difference between the particular religious exemption requested and other secular exceptions already tolerated, and then explaining how such differential treatment furthers some distinct compelling governmental concern." *Id.* As an example, he cited a case holding that the governmental interest "in preventing eagle deaths isn't undermined simply because the government has restricted intentional eagle killings more than accidental ones," for "surely the government has a compelling interest in not subjecting citizens to laws they can't realistically avoid breaking." *Id.* (citing *United States v. Friday*, 525 F.3d 938, 958–59 (10th Cir. 2008)).

Here, there is no question that the governmental interest served by Connecticut's vaccination statute—preventing dangerous diseases—is compelling. *See, e.g.*, *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam); *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997)*.* And Connecticut "hasn't acted in a logically inconsistent way" (*Yellowbear*, 741 F.3d at 61) by continuing to allow medical exemptions while phasing out the religious exemption. There is both "a qualitative" and a "quantitative difference between the particular religious exemption requested and [the] secular exception[] already tolerated" (*id.*): Qualitatively, unlike a religious exemption, the medical exemption advances public health by protecting from the physical harm that vaccination would inflict on them those who cannot safely

13

be vaccinated. Quantitatively, because the number of students who claim a religious exemption is more than ten times greater than the number who claim a medical one (*see* Compl. Ex. D (Doc. 1-4) at 4), allowing religious exemptions poses a much greater threat to Connecticut's efforts to maintain herd immunity and prevent the spread of disease.

Moreover, Connecticut's "differential treatment" of medical and religious exemptions "furthers [a] distinct compelling governmental concern" (*Yellowbear*, 741 F.3d at 61): Allowing a medical exemption and eliminating the religious exemption both advance the state's interest in protecting from harm children whose medical conditions preclude them from being safely vaccinated. These particularly vulnerable children include those who have weakened immune systems or are allergic to vaccine components. *See, e.g.*, Ken Alltucker, *Do 'the right thing': People who can't get vaccinated during a measles outbreak rely on the healthy*, USA TODAY (Apr. 11, 2019), https://bit.ly/3cmjVFx. Just as "the government has a compelling interest in not subjecting citizens to laws they can't realistically avoid breaking" (*Yellowbear*, 741 F.3d at 61), so too it has a compelling interest in not attempting to vaccinate children whose medical condition precludes immunization—as well as safeguarding those vulnerable children's health by disallowing exemptions that could cause other children to infect them.[4]

### CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motions to dismiss.

---

[4] The fact that Connecticut previously allowed a religious exemption and is now phasing it out does not make Connecticut's interests here any less compelling: "Surely the granting of a religious accommodation to some in the past doesn't bind the government to provide that accommodation to all in the future, especially if experience teaches the accommodation brings with it genuine safety problems that can't be addressed at a reasonable price." *Yellowbear*, 741 F.3d at 58.

Respectfully submitted,

/s/ Daniel S. Blinn

Richard B. Katskee*                          Daniel S. Blinn
Alex J. Luchenitser*                         (Federal Bar No. ct0218)
Adrianne M. Spoto*                           CONSUMER LAW GROUP LLC
AMERICANS UNITED FOR SEPARATION OF           35 Cold Spring Rd.
CHURCH AND STATE                             Suite 512
1310 L Street NW, Suite 200                  Rocky Hill, CT 06067
Washington, DC 20005                         Tel: (860) 924-7556
Tel: (202) 466-3234                          Fax: (860) 571-7457
Fax: (202) 466-3353                          *DBlinn@consumerlawgroup.com*
*katskee@au.org*
*luchenitser@au.org*
*spoto@au.org*
*Member, D.C. Bar. Motion for *pro hac
vice* admission filed herewith.

*Counsel for* Amici Curiae

Date: August 5, 2021